## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

---

**In the matter of:**

    **Aaron Richards,**

        **Plaintiff,**

**v.**

**Sturgis Public Schools, Sturgis Public School Board of Education, St. Joseph Intermediate School District, and St. Joseph Intermediate School District Board of Education,**

    **Defendants.**

**CASE NO.**

**Hon:**


**JURY TRIAL DEMANDED**

---

Mark A. Cody (P42695)
Mitchell D. Sickon (P82407)
Michigan Protection and Advocacy Service, Inc.
Attorneys for Plaintiff
4095 Legacy Parkway, Suite 500
Lansing, MI 48911-4263
(517) 487-1755
mcody@mpas.org

Caroline Jackson (Admitted April 11, 2018)
Brittany Shrader (Application for Admission forthcoming)
Attorneys for Plaintiff
National Association of the Deaf Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
(301) 587-7466
caroline.jackson@nad.org

---

## COMPLAINT

## I. INTRODUCTION

1.    Plaintiff, Aaron Richards ("Richards"), by and through his undersigned counsel, hereby submits the following Complaint against Sturgis Public Schools, Sturgis Public Schools

Board of Education, St. Joseph Intermediate School District, and St. Joseph Intermediate School District Board of Education (collectively "Defendants"), Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. §§ 12131 *et seq*.

2.     Throughout Richards' educational career, Defendants have intentionally discriminated against Richards by knowingly and deliberately failing to provide him with a free and appropriate public education ("FAPE"), knowingly and deliberately failing to provide him with an equal educational opportunity, knowingly and deliberately failing to provide the auxiliary aids and services necessary to ensure he had effective communication in the school setting, and otherwise intentionally discriminating against him on the basis of his disability, in violation of Section 504 and Title II of the ADA.

## II. JURISDICTION AND VENUE

3.      This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

4.     Plaintiff has exhausted his administrative remedies for all claims against the ISD and the ISD Board. In an Order dated March 6, 2018, Administrative Law Judge ("ALJ") Robbins dismissed all claims against the ISD and ISD Board.

5.     Plaintiff has exhausted his administrative remedies against the District and the Sturgis Board. ALJ Robbins issued a final Order on October 30, 2018. (See Exhibit A, ALJ Decision and Order of October 30, 2018).

6.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391 because: (i) Defendants operate a place of business within the District and have sufficient contacts with this District to subject them to personal jurisdiction at the time this action is

commenced; and (ii) the acts and omissions giving rise to this claim have occurred within the District.

### III. PARTIES

7.     Plaintiff, Aaron Richards, ("Richards" or "Plaintiff", or if quoting the ALJ Decision and Order "Student" or "Petitioner") is a 19-year-old student with a disability who, at all times relevant to this Complaint, resided in the Sturgis Public Schools District. Richards turned 18 on March 30, 2017.

8.     Richards attended Sturgis Public Schools from 2004 until the spring of 2016. For the fall of 2016, he transferred to the Michigan School for the Deaf ("MSD") in Flint, Michigan. He graduated from MSD with a regular high school diploma in June 2018.

9.     Richards is an individual with a disability within the meaning of Section 504 and the ADA, as he has a physical impairment that substantially limits one or more major life activity, including hearing and speaking.

10.     At all times relevant to this Complaint, Sturgis Public Schools was Richards' home district and as such, was responsible for providing him with both a free, appropriate public education ("FAPE") and the procedural protections required by federal and state special education laws.

11.     Sturgis Public Schools ("Sturgis" or "the District") is a public school district located in Sturgis, Michigan. Sturgis is a recipient of federal financial assistance and is a public governmental entity.

12.     Sturgis Public Schools Board of Education ("Sturgis Board") is the Board of Education for Sturgis Public Schools. The Sturgis Board "exists for the purpose of providing a

system of free, public education for students in grades Pre-K – 12 inclusive."[1] The Sturgis Board has the authority to supervise Sturgis.[2] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others who work at Sturgis.[3] These powers also include making many different kinds of decisions regarding the evaluation, compensation, discipline, and discharge of individual Sturgis personnel.[4] The Sturgis Board is responsible for ensuring Sturgis complies with state and federal laws, including special education and disability rights laws, and to establish district-wide policies.[5] The Sturgis Board is a recipient of federal financial assistance and a public governmental entity.

13.    St. Joseph Intermediate School District ("the ISD") is a regional educational service agency, as defined in M.C.L. 380.4(3), of which Sturgis is a constituent school district. The ISD exists to support and advise its constituent school districts in meeting their obligations under federal and state special education laws. Pursuant to Michigan law, the ISD must "Develop, establish, and continually evaluate and modify in cooperation with its constituent districts, a plan for special education that provides for the delivery of special education programs and services designed to meet the individual needs of each student with a disability [under 26 years of age, who is a resident of 1 of its constituent districts and who has not graduated from high school]" (the "Plan" or the "ISD Plan"), "Contract for the delivery of a special education program or service, in accordance with the intermediate school district plan," and "Employ or engage special education personnel in accordance with the intermediate school district plan."[6]

---

[1] Sturgis Public Schools Bylaws and Policies, Section 0112 "Purpose," available at http://www.neola.com/sturgis-mi/.
[2] *Id.*, Section 0121 "Authority."
[3] *Id.*, Section 0122 "Board Powers."
[4] *Id.*
[5] *Id.*, Section 0123 "Philosophy of the Board."
[6] See MCL 380.1711(a)-(c).

4

The ISD provides special education services and supports to its constituent LEAs, including speech and language therapy and services for deaf and hard of hearing students.[7] Additionally, the ISD receives federal funding to provide special education services. MARSE R. 340.1801. St. Joseph ISD representatives have participated in Richards' Individualized Education Program ("IEP") meetings. The ISD is a recipient of federal financial assistance and a public governmental entity.

14.     The ISD Board of Education ("ISD Board") is the legal entity for providing specialized educational services within the ISD.[8] The ISD Board "exists to serve as a liaison agency between the local school districts in St. Joseph and portions of contiguous counties or the State Department of Education and to provide those educational programs and services requested by the constituent districts or mandated by the State."[9] The ISD Board supervises the ISD.[10] Its powers include educating students and hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others who work at the ISD.[11] These powers also include making many different kinds of decisions regarding the evaluation, compensation, discipline, and discharge of individual ISD personnel.[12] The ISD Board is responsible for ensuring the ISD complies with state and federal laws, including special education and disability rights laws, and establishes appropriate policies that apply to all constituent school districts in its region.[13] The ISD Board is a recipient of federal financial assistance and a public governmental entity.

---

[7] http://sjcisd.org/departments/special-education/.
[8] https://sjcisd.org/district/board-of-education/.
[9] St. Joseph ISD Bylaws and Policies, Section 0112 "Purpose," available at http://www.neola.com/stjosephisd-mi/.
[10] *Id.*, Section 0121 "Authority."
[11] *Id.*, Section 0122 "Board Powers."
[12] *Id.*
[13] *Id.*, Section 0123 "Philosophy of the Board."

15.     ISD employees routinely attend IEP meetings for students attending Sturgis Public Schools. District employees routinely rely on the representations of ISD employees in making decisions regarding the provision of special education and related services.

## IV. FACTS

16.     Richards was diagnosed with severe to profound bilateral sensorineural hearing loss at 18 months of age. Richards has an average intellectual ability. Neuropscyhological testing has not indicated any reason other than being deaf that might impede his academic progress or linguistic development.

17.     From 2004 to 2016, the District engaged in an ongoing practice of failing to provide Richards with an education appropriate to his needs as a student who is deaf or hard of hearing, and the ISD engaged in an ongoing practice of failing to develop a Plan sufficient to ensure that Richards received a FAPE. Due to the District's failure to provide him with the necessary accommodations that would have enabled him to be educated, and the ISD's failure to appropriately advise the District and to develop an appropriate Plan, as of Richards' junior year in high school, he was reading at a first-grade level, performing math at an elementary school level, and possessed the receptive and expressive language skills of a child in late elementary school.

18.     These failures were marked by an ongoing practice of failing to provide sufficient access to individuals who possessed the minimum qualifications for ensuring Richards received a FAPE. For one, the District routinely provided Richards with a teaching assistant who knew some sign language rather than a sign language-fluent interpreter. Consequently, Richards was routinely deprived of *any* access to an individual fluent in the language he was expected to acquire (Signed English), as well as being severely limited in his access to the academic classroom.

6

19.     The ALJ who presided over Richards' due process hearing described Sturgis' conduct as "baffling" (Ex. A at 25) and concluded that "the District failed to provide a free, appropriate public education (FAPE) for Petitioner [Richards]. . . . During his time at Sturgis, Petitioner failed to learn language resulting in his limited understanding of language and ability to use language for learning . . .. This is a denial of FAPE." (Ex. A at 26).

20.     This denial of FAPE was marked by the failure to provide the special education and related services necessary for Richards to learn language, the failure to respond appropriately to Richards' stagnant academic progress, pervasive noncompliance with IDEA substantive and procedural requirements, and the failure to provide the auxiliary aids and services necessary for Richards to access classroom instruction.

21.     Defendants' "baffling" conduct amounts to more than a simple violation of federal and state special education laws. It amounts to intentional discrimination on the basis of disability.

### *Failure To Provide The Special Education And Related Services Necessary For Richards To Learn Language*

22.     The ALJ found that "[c]hildren need good language models early on in order to develop an internalized understanding of language structure. They need exposure to language in order to develop a strong vocabulary. They need exposure to academic language in order to develop knowledge and understanding of the world around them." (Ex. A at 20).

23.     Because Richards is deaf, he cannot acquire language as most children do, simply by listening to it. Rather, he requires consistent exposure to and instruction in a visual language, such as sign language, and/or substantial interventions designed to allow him to access and acquire spoken language.

24.     From 2004 until 2016, Sturgis and the ISD provided neither.

25.     The ALJ found that "Petitioner's lack of exposure to accessible language models limited his understanding of language and ability to use language for learning. . . . Petitioner has had linguistic deprivation as a result of the pattern of very limited early exposure to an accessible language and chronic absence of a linguistically accessible environment through most of his life." (Ex. A at 21).

26.     The ALJ found that "[d]espite the early recognition of the need for sign instruction and instruction in sign, the quality and availability of sign models were highly variable and often limited including lengthy periods of time when there was no direct instruction in sign or interpreting available. Further, Petitioner's only exposure to visually accessible language was through his paraprofessional aides (when available), limited time with teachers of the deaf and some sign communication at home. The majority of time the Petitioner spent in school he had no other communication options, models, or opportunities with teachers or peers." (Ex. A at 20).

27.     The ALJ found that Richards "has had linguistic deprivation as a result of the pattern of very limited early exposure to an accessible language and chronic absence of a linguistically accessible environment through most of his life." (Ex. A at 21).

28.     On November 28, 2000, when Richards was 18 months old, the ISD conducted a multidisciplinary evaluation of Richards and found that he was deaf, which adversely affected his educational performance. The ISD evaluation team did not find any cognitive deficits.

29.     On November 26, 2003, the ISD conducted another multidisciplinary evaluation and found that Richards continued to be a student who is deaf and therefore eligible for special education and related services under the IDEA. The ISD also found Richards eligible as a student with a speech and language impairment, secondary to being deaf or hard of hearing.

30.    As a young child, Richards received a cochlear implant. While the implant allows Richards some access to sound, it does not provide him with constant exposure to English that is understandable. Therefore, his cochlear implant does not provide Richards nearly the level of language immersion that other children experience, and he cannot acquire English in the same manner that other children do (i.e., by listening to it). Consequently, Richards could not understand spoken communication in his classroom without visual support.

31.    In Richards' June 1, 2005 IEP, the District determined that he required sign language support to benefit from his academic environment. The District determined that support should be provided by using signs that corresponded with English words, a system known as "Signed English."[14]

32.    Thereafter, the District provided Richards with 1-3 hours per week with a Hearing-Impaired Teaching Consultant, employed by the ISD. Although the Hearing-Impaired Teaching Consultant was qualified to teach sign language to Richards, 1-3 hours per week of language instruction is not sufficient to enable anybody to learn a new language. Further, the Hearing-Impaired Teaching Consultant had multiple obligations to fulfill during that time beyond instructing Richards in sign language, such as teaching Richards reading and writing.

33.    The District committed to providing Richards with paraprofessional support throughout the school day. However, the aide assigned to Richards was not a sign language interpreter and did not know sign language at all. Rather than being able to teach Richards sign language, the aide had to try to learn sign language along with him.

---

[14] Signed English is a signing system that adapts the vocabulary of American Sign Language to correspond exactly with English vocabulary, and to use English grammar and communication structure. By contrast, American Sign Language has a distinct vocabulary, grammar, and communication structure from English; children learning American Sign Language must learn English separately. Signed English is not a language on its own, but a version of English made visual, albeit a version of English that is missing a wide variety of vocabulary terms. In comparison, American Sign Language is a distinct visual language that requires no previous understanding of English or any other language.

34.     Because the aide was not fluent in sign language and was not a sign language interpreter, she could not model for Richards the full range of vocabulary and grammar typical for students his age. Further, to convey to Richards what the students and teachers were saying, the aide had to simplify classroom content to a level commensurate with her own limited signing skill. Therefore, the aide could not expose Richards to the language and communication typical of an elementary school classroom, depriving him of this opportunity to learn language.

35.     During the 2007-2008 school year, when Richards was in second grade, the District conducted an evaluation of Richards' language ability that indicated he had the language level of a four-year-old.

36.     Despite noting that Richards' language was severely delayed, the District made no attempt to increase the services designed to teach Richards language, such as time with the speech-language pathologist or with the teacher of the deaf. The District also made no attempt to improve the qualifications of the individual serving as Richards' sole language model.

37.     Despite noting that Richards' language was severely delayed, the District never repeated the evaluation of Richards' language ability. Therefore, the District could not monitor whether Richards' language improved in response to the special education and related services it provided.

38.     By fourth grade, the District noted in writing that Richards could not understand anything that was said in class. Nevertheless, the District made no effort to increase Richards' exposure to an accessible language, such as sign language.

39.     The unqualified aide who was trying to learn sign language served as Richards' sole source of language modeling and communication throughout elementary school, and then resigned from the District.

40. Sturgis did not increase Richards' language instruction in any meaningful way during middle school.

41. Sturgis did not evaluate Richards' language level at any point during middle school.

42. An academic evaluation of Richards conducted his eighth-grade year noted that Richards' writing was "full with misconceptions about how language is put together." Teachers stated that Richards "writes how he speaks," indicating that his spoken English exhibited the same "misconceptions about how language is put together" as his writing.

43. Sturgis did not increase Richards' language instruction in any meaningful way during high school.

44. Sturgis did not evaluate Richards' language level until the end of his junior year of high school, after his mother had hired an advocate and solicited the assistance of the Michigan Department of Education.

45. At that time, the most optimistic test of Richards' language skills placed his ability in the 9 to 11-year old range.

46. The ALJ found that, "Petitioner demonstrated ongoing deficits in language and language-related academic skills, Petitioner's language knowledge and competence are limited. Petitioner's knowledge of language structure, vocabulary and information base remain a deficit. Petitioner's knowledge of the world, his knowledge of words to describe his thoughts and experiences and his knowledge of basic language structure or how to put words/signs into meaningful sentences remains limited." (Ex. A at 20).

47. The ALJ found that "Petitioner demonstrated limited understanding of the structure of English; communicating in English using partial sentences that are missing elements

11

of syntax such as prepositions and articles and are missing grammatical markers such as appropriate tense markers." (Ex. A at 20).

48.     The ALJ found that both experts who evaluated Richards "found significant language deprivation to the extent that in the Fall of 2016 during which Petitioner was a senior in high school, he was found to be below the first percentile in verbal communication skills." (Ex. A at 23).

49.     Importantly, this entire time the District purported to use either spoken or signed English as Richards' language of instruction. Richards' limited ability to communicate in *any* language—signed or spoken—is attributable solely to the District's failure to provide Richards with appropriate language models or language instruction for approximately 12 years.

50.     Equally critical to Richards' failure to develop language skills of any kind was his 12-year lack of access to formal instruction in sign language and to signing peers. Throughout Richards' entire time at Sturgis, his time with the ISD Hearing Impaired Teaching Consultant – the individual responsible for teaching sign language to Richards – remained steady or decreased. Richards never received sufficient time with the ISD Hearing Impaired Teaching Consultant to fully learn sign language. Further, Richards had no opportunity whatsoever to communicate with signing peers, also inhibiting his ability to learn sign language.

51.     The ALJ found that "[d]espite the District's clear knowledge that Student required a visual language, the District made no attempts to ensure that a visual language was taught to Student during his time in high school until 2016." (Ex. A at 25). The "summer school services in ASL" that Sturgis provided in 2016 were "the only concerted effort by District to provide Petitioner any direct education in a visual language prior to Petitioner's enrollment in MSD." (Ex. A at 25).

52.     Richards never received sufficient formal instruction in sign language via the ISD Hearing Impaired Teaching Consultant, or sufficient access to signing peers, due to the ISD's failure to develop a Plan that would give Richards the access he needed. On information and belief, the ISD knew Richards was not receiving sufficient formal instruction in sign language or access to signing peers, yet intentionally failed to develop a Plan that would provide Richards with such access.

53.     At the Due Process Hearing, multiple Sturgis employees testified under oath that they made their decisions as an IEP Team in reliance on representations of an ISD employee. Therefore, the ISD caused Richards to have insufficient access to the ISD Hearing Impaired Teaching Consultant to acquire language.

### The Defendants' Failure To Respond Appropriately To Richards' Stagnant Academic Progress

54.     The ALJ found that "Petitioner was clearly not making any progress at Sturgis despite passing his classes." (Ex. A at 25). She noted that Richards "started high school with his assessment levels between K [sic] and third grade. These levels remained the same through the day he left Sturgis Public School." (Ex. A at 24). "[E]very IEP included the assessment result for Petitioner which remained the same through the ninth grade, tenth grade and eleventh grade." (Ex. A at 25).

55.     The ALJ found that Sturgis performed "few formal assessments" on Richards. Sturgis assessed his language development at ages 4 and 8, but not thereafter, despite test results showing his language was limited. "The first formal academic assessment was reported at age 13. The second academic assessment and the first known cognitive assessment was not completed until April 2016 when Petitioner was 17." (Ex. A at 19-20).

13

56.     The ALJ further found that children "need a solid understanding of language in order to learn to read, to write and often to problem solve. Petitioner's lack of exposure to accessible language models limited his understanding of language and ability to use language for learning." (Ex. A at 20-21). Therefore, Defendants' failure to provide the special education and related services necessary for Richards to acquire language made it nearly impossible for Richards to learn, regardless of how hard he worked.

57.     Richards' Individualized Educational Program ("IEP") reflects that he rarely achieved the individualized goals set for him each year, especially in language-related areas. For example, this IEP included a goal that Richards would use appropriate present-tense word-endings (-s, -ing, etc.) each year from second grade until his sophomore year of high school. He never achieved the goal; it simply was abandoned.

58.     Evaluations of Richards' academic performance reflect the severe deficits in the educational access that the District provided.

59.     Standardized tests from Richards' third-grade year reflect regression in reading and language arts over the course of the year. Despite this regression, Sturgis did not offer Extended School Year services to Richards.

60.     Richards' academic performance regressed again between his third and fourth-grade years. Despite this regression, Sturgis did not offer Extended School Year services to Richards.

61.     A variety of academic tests administered in Richards' eighth-grade year showed he was reading at a second-grade level and had tested "Not Proficient" in both science and math.

62.    Formal, norm-referenced academic evaluations performance on Richards his eighth-grade year placed his reading comprehension at the beginning second grade level and his math skills at the late elementary level.

63.    One of the academic tests involved an interview. The interviewer described Richards' "basic reading skills and reading comprehension skills" as "extremely low." For example, one task involved writing down a dictated paragraph. The paragraph was presented both in spoken English and using the so-called interpreter. The examiner noted "[i]t was unclear how much of the written language deficit was difficulty understanding what was dictated in the first place or how much was due to having difficulty expressing himself."

64.    Despite these clear deficits in Richards' ability to read and write, there was no increase in Richards' time with the ISD Hearing Impaired Teaching Consultant. Extended School Year services were not offered.

65.    Richards' sophomore year of high school, Sturgis administered an academic evaluation intended specifically for deaf and hard of hearing students, the iReady. On this evaluation, Richards tested at a first-grade level in English and a third-grade level in Mathematics.

66.    Despite this regression, there was no increase in Richards' time with the ISD Hearing Impaired Teaching Consultant. Extended School Year services were not offered.

67.    The ALJ found that Richards "started high school with his [academic] assessment levels between K [sic] and third grade. These levels remained the same through the day he left Sturgis Public Schools. From the record, the District made no effort to determine why Petitioner made no progress on his reading, writing or math levels." (Ex. A at 24).

68.     The ALJ also found that Richards' "mother requested additional evaluations in February 2016. District personnel found no reason for additional evaluations despite its clear knowledge that Student's progress had stagnated." (Ex. A at 24).

69.     When Sturgis finally did evaluate Richards' academic performance in 2016, the results were bleak.

70.     Sturgis' own evaluator, Todd VanderAkker, "found that Petitioner is a very bright young man" but was "well below grade level in both math and reading. Petitioner's reading skills appear to be quite basic and problematic with respect to enabling him to succeed in a high school level curriculum where language demands are high." (Ex. A at 17).

71.     Per the ALJ, this evaluator found that Richards "did not appear to demonstrate a learning disability, but his skills reflect more his language limitations stemming from the hearing loss and apparent sparse exposure to and/or instruction in sign language to supplement auditory input." (Ex. A at 17).

72.     Mr. VandenAkker's report reflected that Richards had fallen even farther behind his peers since eighth grade. For example, Richards' Letter and Word Recognition skills had fallen from the 3rd percentile to below the 1st percentile. Richards' Math Computation abilities had fallen from the 21st percentile to the 8th percentile.

73.     In the fall of 2016, a neuropsychologist, Dr. Peter Isquith, conducted an independent educational evaluation of Richards.

74.     The ALJ found that, according to Dr. Isquith's report, Richards' "written language skills are impaired. His basic reading skills were below the 1st percentile with somewhat better understanding of reading material at the 10th percentile. Writing was at the 5th percentile and listening was at the 1st percentile for age appropriate academic material. Math is

related to language development and Petitioner's access to math instruction was likely impaired by limited communication as his math skills were measured below the 10th percentile." (Ex. A at 20).

75.     Although Richards managed to pass his classes each year, he did so only with substantial one-on-one support. He had one-on-one assistance with every single reading and writing-based assignment in every class. Every question was read to him and explained. Every answer was written for him, with help putting his thoughts into words.

### Specific Procedural Violations Of Federal And State Special Education Laws

76.     The ALJ found that "[w]hile the District held the IEP meetings every year as required, it does not appear that the District actually considered any of the information in a meaningful way. . . . There has been no evidence presented that any evaluations were considered to attempt to identify the problem. No real discussion appeared to consider the supplementary aids or services." (Ex. A at 24).

77.     The ALJ found that "[t]he supplementary aids and services remained virtually identically [sic] in every IEP from 2014 to 2016 despite Petitioner's assessment remaining significantly below grade level. . . . The supplementary aids and services clearly did not do anything to improve Petitioner's reading, math or comprehension grade levels." (Ex. A at 24).

78.     The ALJ noted that "the IEP Team was required to consider the child's language and communication needs" because he was deaf. (Ex. A at 25). She found that "it is unclear if or how the District or IEP team actually considered any communication with peers or professional personnel in light of the difficulties obtaining interpreters. Merely including in an IEP that the team considered language and that Student would receive all instruction in sign but then not actually having competent interpreters is not in compliance with IDEA requirements." (Ex. A at 25).

79.     The ALJ found that "despite Petitioner's known hearing impairment and the MARSE rule requiring that the MSD [Michigan School for the Deaf] be considered within the educational placement continuum for hearing impaired students [MARSE R 340.1721e(5)], Sturgis never considered this program during any of Petitioner's IEPs prior to May 2016. It is baffling as to why such a placement was never considered . . . ." (Ex. A at 25).

80.     As an entity present at Richards' IEP meetings, the ISD knew of all of the blatant legal violations that the ALJ identified. Multiple Sturgis employees testified that they acted in reliance on the ISD's representations, and that they never refused to take an action that the ISD employee recommended. Therefore, the ISD did not take any action reasonably calculated to ensure that Richards would receive the educational services he was entitled to by law.

### Failure To Provide Richards Meaningful Access To Classroom Instruction

81.     During his entire time at Sturgis, Richards could not access the language spoken in the classroom, due in part to the absence of a qualified sign language interpreter. Sturgis failed to provide a qualified sign language interpreter at any point during Richards' elementary school and middle school years. In high school, Sturgis provided "sporadic" access to interpreters. (See Ex. A at 22).

82.     The ALJ found that an evaluation of Richards' auditory processing skills done in 2016 revealed that he "was unable to imply meaning, infer or make logical conclusions for information that was presented auditorily." This indicated that Richards had no ability to understand what was said in his classrooms without visual language.

83.     In fourth and fifth grade, Richards' IEPs indicated that he could not understand what teachers or students were saying and that he needed a qualified sign language interpreter. Still, Sturgis failed to provide a qualified sign language interpreter.

18

84.     For the first six months of middle school, Richards was assigned a new paraprofessional who was a proficient signer; however, the aide was not a qualified interpreter. After six months of working with Richards, the aide left, and the District failed to provide any sign language support for some time.

85.     On March 8, 2012, the District convened an IEP team meeting to develop a plan for Richards that would be in place for the remainder of the 2011-2012 school year, and the subsequent school year. In the resulting IEP, the District committed to providing Richards with an educational interpreter.

86.     The District did not provide a qualified sign language interpreter to Richards during his seventh-grade year or any prior year.

87.     At the start of the 2012-2013 school year, Richards' eighth-grade year, an educational interpreter was not provided by the District, despite the March 8, 2012 IEP calling for one. The District transferred a teaching assistant who knew some sign language to work with Richards, however, this person was not a qualified interpreter.

88.     Sturgis began providing an interpreter in October 2012. This person was not a qualified interpreter, however, and only worked with Richards for a short period of time.

89.     Thereafter, Sturgis provided qualified sign language interpreters "sporadic[ally]." (Ex. A at 22).

90.     The ALJ found that "[b]etween 2014 and 2016, Petitioner had several individuals with varying skill sets serving as the 'educational interpreter,' . . . . Petitioner had seven classes, but an interpreter was present generally only in two to three of his classes during his freshman and sophomore years." (Ex. A at 22).

19

91.     Further, with one exception, these interpreters did not provide the pre-teaching and re-teaching of vocabulary necessary for Richards to benefit from their presence in the classroom.

92.     Throughout this entire time, Sturgis never disputed that Richards required a sign language interpreter to access instruction. Therefore, the absence of a qualified sign language interpreter was due solely to Sturgis' failure to provide one.

### Richards Made Tremendous Progress When Finally Provided A FAPE

93.     In the fall of 2016, Richards began attending the Michigan School for the Deaf (MSD).

94.     The ALJ found that "MSD is the only school for the deaf located in the State of Michigan. All the staff use ASL as the primary communication. All the staff are certified hearing–impaired teachers. It is a language rich environment for a student who uses ASL." (Ex. A at 25).

95.     Despite the fact that MSD accepted 100% of the credits Richards earned at Sturgis, he still took two years to complete his senior year of high school.

96.     In these two years at MSD, Richards was able to make gains in mathematics and reading that placed him at the high school level in both subject areas.

97.     The ALJ found that "Petitioner's progress at MSD shows what the District should have known all along – Petitioner is capable of making academic progress if given the appropriate educational environment and supports." (Ex. A at 25-26).

### Despite Progress, Richards' Deficits Will Persist

98.     The ALJ found that "[a]lthough Petitioner received a regular high school diploma in 2018, this does not cure the denial of FAPE caused by the District's actions prior to placing Petitioner at MSD." (Ex. A at 27).

99.     The ALJ ordered compensatory education in the form of a placement at the SouthWest Collegiate Institute for the Deaf (SWCID). The ALJ found that SWCID "offers a Developmental Education Program-Success Initiative for students that do not have college-level skills. The classes are taught in ASL." (Ex. A at 22).

100.    In addition, the ALJ found that Richards' "limited language competence and the impact on his knowledge and academic skills is permanent. The long-term impact of Petitioner's language and academic deficits secondary to limited exposure to language is varied and far-reaching. Given Petitioner's cognitive ability and desire to achieve and have a career, Petitioner would have been a good candidate for college. He is not a viable candidate for college at this point though he might gain sufficient academic skills to gain entrance to a community college program. This limits his career options." (Ex. A at 21).

101.    The ALJ found that Richards "missed nearly two decades of social information that will hamper his future relationships, including those with potential partners/spouses and his own children." (Ex. A at 21). This finding was consistent with Richards' testimony that he had only a handful of friends at Sturgis. Their relationship consisted almost exclusively of Richards asking this "friend" a question in class and the "friend" answering him.

102.    The ALJ found that the gains in communication skills, social information, knowledge about the world and academic skills Petitioner made at MSD "are likely to remain small relative to the substantial gaps between what Petitioner can do and normal expectations." (Ex. A at 21). These "substantial gaps between what Petitioner can do and normal expectations" are likely to persist for the rest of his life, affecting his earning potential, ability to secure meaningful work, and ability to maintain meaningful interpersonal relationships.

*Defendants Withheld Crucial Information Regarding Its Violative Conduct*

103.  Although Richards filed for due process thirteen years into his schooling, the ALJ found that Richards did not know and should not have known about the crux of his Complaint until more recently. Consequently, the ALJ "found that Petitioner filed the Due Process Hearing Complaint within two years of the date he knew or should have known about the language deprivation" undergirding the legal violation. (Ex. A at 26).

104.  Throughout his academic career at the District, Richards' mother attempted to advocate for her son and obtain better services, but these efforts were unsuccessful. Often, Richards' mother was persuaded to accept sub-standard services, such as an assistant who knew basic sign instead of a sign language interpreter, due to Sturgis' representation that better services were not available.

105.  The ALJ found that the District "was obligated to determine the cause of [Richards'] failure to progress and the mother should have been allowed to rely upon the District's expertise." (Ex. A at 26).

106.  Rather than educate Richards' mother, the District and the ISD withheld information that would have revealed the full extent of Richards' educational deprivation. While the District repeatedly tested and reported Richards' slow progress in academic areas, such as reading, writing, and mathematics, the District never explained the implications of these findings to Richards' mother. In addition, the District never assessed Richards' intelligence, which would have shown he was capable of performing at or above grade-level, as opposed to falling farther, and farther behind.

107.  The ALJ found that "based on the District's actions, there was no reason for Petitioner's mother to be aware of the [linguistic] deprivations. As she testified, no one at the District seemed concerned and she thought that the District's staff were the experts. It was not

until Dr. Isquith reported the actual ongoing harm happening to the Petitioner that the Petitioner's mother realized the problem." (Ex. A at 26).

108. The ALJ noted that in 2012, Richards' mother, Colleen Hagadorn, filed a due process complaint due to the absence of the sign language interpreter that the school had committed to provide since March of that year. (Ex. A at 26). However, the ALJ found that she did not know about the language deprivation Richards suffered, reasoning "[i]t would seem to logically follow that if Petitioner was aware of the significant language deprivation that Petitioner suffered, she would have brought that allegation as well." (Ex. A at 26).

## *Conclusion*

109. Richards is an intelligent and cooperative person who, even as a deaf man, could have been expected to graduate high school, attend college, obtain gainful employment and lead a normal, productive life. Due to the District's 12-year failure to provide him with appropriate language instruction, language models, or communication access to his classroom, Richards has no hope of even approaching this level of academic, vocational, or social success and likely will be limited to unskilled labor and immature social interactions.

110. The District's 12-year failure to provide Richards with language instruction and access was due, at least in part, to the ISD's failure to develop a Plan that could provide such instruction and access. The District's 12-year failure was also due, at least in part, to the information that the ISD provided and the District relied upon without further inquiry. This injury has caused and will continue to cause Richards and his family to experience severe emotional distress as well as loss of future earnings and long-term economic hardship.

111. On information and belief, the District acted according to a policy or widespread practice of failing to provide a FAPE to deaf and hard of hearing students. Richards is not the

only deaf student within the District to have suffered a longstanding and egregious deprivation of a FAPE and other civil rights.

112.    The Sturgis Board is responsible for setting policies for the District and therefore is responsible for any injuries that Richards sustained.

113.    The Sturgis Board has sufficient powers regarding the hiring, firing, and supervision of Sturgis employees to be held liable for their acts.

114.    On information and belief, the ISD acted according to a policy or widespread practice of failing to provide a FAPE to deaf and hard of hearing students. Richards is not the only deaf student within the ISD to have suffered a longstanding and egregious deprivation of a FAPE and other civil rights.

115.    The ISD Board is responsible for setting policies for the ISD and therefore is responsible for any injuries that Richards sustained.

116.    The ISD Board has sufficient powers regarding the hiring, firing, and supervision of ISD employees to be held liable for their acts.

117.    Defendants' acts have deprived Richards of the FAPE he is entitled to by law.

118.    Defendants' acts have deprived Richards of his equal opportunity to receive the benefits that other participants in Defendants' programs and services enjoy.

119.    Defendants' acts were knowing and intentional.

120.    Defendants acted in bad faith and/or exercised gross misjudgment.

121.    Richards was unable to bring these claims earlier due to minority and due to administrative exhaustion requirements.

122.    Richards reached the age of majority on March 30, 2017.

123.    Richards initiated a Due Process Complaint on December 27, 2017 and received a final Decision and Order on October 30, 2018.

## V. COUNTS

### A.    DEFENDANTS VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

124.    Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

125.    Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

126.    The regulations regarding Preschool, Elementary, and Secondary Education apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31.

127.    In general, "[a] recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

128.    Defendants, Sturgis and Sturgis Board, are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

129.     Defendants, the ISD and the ISD Board, are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

130.     Richards is a person with a disability within the meaning of 29 U.S.C. § 794.

131.     Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to provide the auxiliary aids and services needed to ensure effective communication.

132.     Defendants have intentionally discriminated against Richards in violation of Section 504 by acting in bad faith and with gross misjudgment in knowingly and intentionally failing to abide by federal and state special education laws.

133.     The District and the Sturgis Board acted in reliance on the ISD, sufficient for the ISD to be held liable for the acts and omissions of the District.

134.     Defendants knowingly and intentionally failed to provide a FAPE to Richards, in violation of federal and state special education laws.

135.     Defendants knowingly and intentionally concealed this failure from Richards and his family.

136.     Defendants did not provide the special education and related services necessary for Richards to develop language, in violation of federal and state special education laws.

137.     Defendants did not provide Richards with consistent exposure to an accessible mode of language such as sign language, in violation of federal and state special education laws.

138.     Defendants did not address Richards' lack of progress towards the goals in his IEP, in violation of federal and state special education laws.

139.    Defendants restricted Richards' individualized education program to the programs and services available, in violation of federal and state special education laws.

140.    Defendants failed to consider placing Richards at the Michigan School for the Deaf, in violation of state special education law.

141.    Defendants failed to consider Richards' language and communication needs, opportunities for direct communications with peers and professional personnel in his language and communication mode, academic level, and full range of needs, including opportunities for direct instruction of his language and communication mode, in violation of state and federal special education law.

142.    Defendants never evaluated Richards' proficiency in sign language, in violation of federal and state special education laws, thereby withholding information regarding his progress in acquiring sign language.

143.    Defendants never evaluated Richards' overall language proficiency (signed and spoken), in violation of federal and state special education laws, thereby withholding information regarding his progress in acquiring language.

144.    Defendants did not address Richards' functional needs, such as his need for socialization, in violation of federal and state special education laws.

145.    Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to ensure the availability of the services and supports necessary for Richards to receive an appropriate education and/or effective communication with his peers and others.

146.    Defendants failed to consider the total continuum of services for students who are deaf or hard of hearing, in violation of federal and state special education laws.

147.   Defendants failed to provide direct instruction and direct interaction with peers, in violation of federal and state special education laws.

148.   Defendants did not provide Richards with extended school year services nor did it keep data to determine whether extended school year services were necessary, in violation of federal and state special education laws.

149.   Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to provide adequate resources, technical assistance or supervision to ensure that Richards received an appropriate education and/or effective communication, in violation of federal and state special education laws.

150.   Defendants have otherwise intentionally discriminated against Richards in bad faith and/or with gross misjudgment in violation of Section 504.

151.   As a direct and proximate cause of Defendants' violation of Section 504, Richards has suffered and continues to suffer severe and grievous mental and emotional suffering, humiliation, stigma, loss of future earnings, and other injuries he will continue to suffer.

152.   The Defendants, through their actions and failure to accommodate Richards, have denied Richards meaningful, equal access to classroom instruction and an opportunity for language learning equal to his peers.

### B.   DEFENDANTS VIOLATED TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131 et seq.

153.   Plaintiff incorporates by reference all previous paragraphs of the Complaint herein.

154.   Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

28

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. (*See also* 28 C.F.R. Part 35).

155. Defendants are each a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

156. Richards is a person with a disability within the meaning of 42 U.S.C. § 12102.

157. Defendants have intentionally discriminated against Richards in violation of Title II by acting in bad faith and with gross misjudgment in failing to provide a FAPE and concealing this failure from Richards and his family.

158. Defendants have intentionally discriminated against Richards in violation of Title II by intentionally and knowingly violating federal and state special education laws, as set forth above.

159. Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to provide the auxiliary aids and services needed to ensure effective communication.

160. Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to ensure the availability of the services and supports necessary for Richards to receive an appropriate education and/or effective communication.

161. Defendants have intentionally discriminated against Richards in bad faith and with gross misjudgment by failing to provide adequate resources, technical assistance or supervision to ensure that Richards received an appropriate education and/or effective communication with his peers and others.

162. Defendants intentionally violated Richards' rights under the ADA and the regulations promulgated hereunder by acting in bad faith and with gross misjudgment while

excluding him from participation in and denying him the benefits of Defendants' services, programs, and activities, and by subjecting him to discrimination in violation of 42 U.S.C. § 12132.

163. Defendants otherwise intentionally discriminated against Richards in violation of 42 U.S.C. § 12132.

164. As a direct and proximate cause of Defendants' violations of the ADA, Richards has suffered and continues to suffer severe and grievous mental and emotional suffering, humiliation, stigma, loss of future earnings, and other injuries he will continue to suffer.

165. The Defendants, through their actions and failure to accommodate Richards, have denied Richards meaningful, equal access to classroom instruction and an opportunity for language learning equal to his peers.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.      Find that Defendants violated state and federal law;

B.      Find that Plaintiff is the prevailing party;

C.      Order declaratory and equitable relief;

D.      Award Plaintiff compensatory damages;

E.      Award Plaintiff his reasonable attorneys' fees and costs; and

F.      Any other relief deemed necessary.

Respectfully submitted,

Dated: December 21, 2018                /s/ Mark Cody
                                        Mark Cody (P42695)
                                        Mitchell D. Sickon (P82407)
                                        Michigan Protection and Advocacy Service, Inc.
                                        4095 Legacy Parkway, Suite 500
                                        Lansing, MI 48911
                                        (517) 487-1755
                                        mcody@mpas.org

                                        Caroline Jackson (Admitted April 11, 2018)
                                        Brittany Shrader (*Admission application
                                        forthcoming*)
                                        National Association of the Deaf Law and
                                        Advocacy Center
                                        8630 Fenton Street, Suite 820
                                        Silver Spring, MD 20910
                                        (301) 587-7466
                                        caroline.jackson@nad.org

                                        *Attorneys for Plaintiff*